**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RUMPH & ASSOCIATES, P.C.

   *Plaintiff,*

   v.

PM CONSULTING GROUP, LLC d/b/a
VISTANT, LLC

   *Defendant*.

Civil Action No. 25-cv-1293-ELH

**MEMORANDUM OPINION**

In this breach of contract action, plaintiff Rumph & Associates, P.C. ("Rumph") filed suit against defendant PM Consulting Group, LLC d/b/a Vistant, LLC ("Vistant").[1]  ECF 1.  The Complaint contains one count, titled "Breach of Contract."  *Id.* at 4.

Rumph alleges that Vistant entered into a contract with Rumph by which Rumph was to "perform 49% of the work awarded to Vistant" in connection with a contract between Vistant and the United States Agency for International Development ("USAID").  ECF 1, ¶ 7.  But, according to Rumph, Vistant allocated to Rumph "substantially less than 49% of all Direct Labor."  *Id.* ¶ 14.  Rumph alleges that it has suffered damages in excess of $2,000,000.00.  *Id.* ¶ 17.

On May 2, 2025, Rumph submitted "proof of service" of the suit.  ECF 5 ("Proof of Service").  It reflects that, on May 1, 2025, Joseph Sneddon, a private process server, served summons on Patty Grindlesberger, "who is designated by law to accept service of process on behalf of" Vistant.  *Id.*  The Proof of Service identifies Grindlesberger as a paralegal for Northwest

---

[1] Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332.

Registered Agent Service, Inc., which is Vistant's registered agent. *Id.* Vistant failed to respond to the suit. *See* Docket.

Accordingly, on June 12, 2025, Rumph moved for an "Order Of Default." ECF 7. The Clerk entered an order of default that day, pursuant to Fed. R. Civ. P. 55(a). ECF 8. The Clerk also sent a "Notice Of Default" to Vistant on that date. ECF 9 ("Notice"). The Notice informed Vistant that "an order of default was entered" against Vistant and that Vistant had thirty days from the date of the Notice to "file a motion to vacate the order of default." *Id.* In addition, it warned that if Vistant did "not take action," the Court would "act promptly on any pending motions for entry of default judgment, which may result in a monetary judgment against" Vistant. *Id.*

On August 29, 2025, Rumph moved for default judgment against Vistant, pursuant to Fed. R. Civ. P. 55(b) (ECF 14), supported by a memorandum (ECF 14-1) (collectively, the "Motion") and eleven exhibits. ECF 14-2 to ECF 14-12. Rumph seeks damages of $129,774.79 for unpaid invoices associated with work that Rumph performed for Vistant. ECF 14 at 1. In addition, Rumph seeks $1,556,093.52 in lost profits associated with workshare that Rumph claims it was contractually entitled to receive from Vistant. *Id.* Rumph also requests $37,313.27 in attorneys' fees and costs. *Id.*

As discussed in my Memorandum and Order of February 27, 2026 (ECF 15), plaintiff's counsel electronically filed Rumph's Motion with the Court. But, because Vistant has never entered an appearance in this case, it would be unlikely that Vistant received electronic notification of the Motion. And, plaintiff's counsel made no attempt to serve Vistant with the Motion and accompanying exhibits, by mail or otherwise. *Id.* at 2-3; *see* ECF 14 at 3.

Therefore, I denied the Motion, without prejudice, and directed plaintiff "to serve or attempt to serve Vistant with a copy of the Motion and its exhibits, along with a copy of this

Memorandum and Order, at the addresses contained in the record[.]" ECF 15 at 6.  Furthermore, I directed plaintiff's counsel to "file an affidavit with the Court, confirming service or the efforts to serve Vistant with the above referenced documents."  *Id.*

On March 16, 2026, Rumph filed two sworn statements from process servers attesting to Rumph's attempts to serve Vistant.  ECF 16; ECF 17.  Rumph successfully served Vistant's registered agent with the requisite documents on March 6, 2026.  ECF 16.  Accordingly, and for the reasons stated in my Order of April 6, 2026 (ECF 18), I am satisfied that plaintiff has served Vistant.

Rumph renewed its Motion on April 8, 2026.  ECF 19.  Vistant has not responded to the Motion, and the time to do so has expired. *See* Local Rule 105.2(a).

No hearing is required. *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, in part.

## I.      Factual Background

Rumph is a "global impact firm providing federal, state, local government, private sector, and nonprofit clients with . . . professional services, accounting and auditing, and institutional support in a variety of industries and sectors, including public health." ECF 1, ¶ 1.  According to Rumph, "Vistant is an 8(a) certified small disadvantaged business that delivers professional services and IT solutions to federal agencies." *Id.* ¶ 2.

According to plaintiff, on March 24, 2021, Rumph and Vistant entered in a "teaming agreement, whereby Vistant would be the prime offeror, and the parties would work together to submit a response to" USAID's "Request for Proposal Number RFQ1477150" (the "Solicitation") to provide services for the "USAID Middle East and North Africa Institutional Support Services

('MENA-ISS') Blanket Purchase Agreement ('BPA')[.]" *Id.* ¶ 6.[2]   Plaintiff claims that, pursuant to this teaming agreement, "Rumph would act as the subcontractor to Vistant and that Rumph would perform 49% of the work awarded to Vistant in connection with the . . . Solicitation." *Id.* ¶ 7.

"On or about June 8, 2021, USAID awarded Vistant the $35 million MENA-ISS BPA to provide institutional support services for USAID regional and bilateral programs in the Middle East and North Africa (MENA) region (the 'Prime Contract')." *Id.* ¶ 8  Rumph asserts: "Consistent with the terms of the Teaming Agreement, Rumph and Vistant entered in a Subcontract Agreement . . . effective July 20, 2020, in which Rumph agreed to provide support services to Vistant under the USAID Prime Contract." *Id.* ¶ 9.

Rumph appended to its Complaint a copy of the Subcontract Agreement.  *See* ECF 1-1. Section A.1 of the Subcontract provides, in relevant part, *id.* at 4 (emphasis in original):

> This subcontract agreement is valued under the USAID MENA-SS BPA Contract, the workshare for RUMPH ASSOCIATES shall receive 49% of the total effort based on the requirements of the task order solicitations. The Period of Performance: 06/08/2021 to 06/08/2026 including one base year plus four option year [sic] . . . .
>
> **Base Year:** The base year is for a period of 12 months from July 1, 2021 to July 30, 2022.
>
> **Option Year I:** Option Year I is for a period of 12 months from July 1, 2022 to June 30, 2023.
>
> **Option Year II:** Option Year II is for a period of 12 months from July 1, 2023 to June 30, 2024.
>
> **Option Year III:** Option Year III is for a period of 12 months from July 1, 2024 to June 30, 2025.

---

[2] Plaintiff did not append a copy of the teaming agreement to its Complaint or to the Motion.

**Option Year IV:** Option Year IV is for a period of 12 months from July 1, 2025 to June 30, 2026.

The parties subsequently executed a modification to the Subcontract, effective February 1, 2023. *Id.* ¶ 11. Plaintiff appended the modification agreement to the Complaint. ECF 1-2 (the "Modification"). I shall refer to ECF 1-1 and ECF 1-2 collectively as the "Subcontract Agreement" or the "Subcontract Agreements." The Modification also provided that Rumph would receive 49% of the direct labor requirements under the USAID Prime Contract. ECF 1-2 at 4.

Rumph alleges that, under the Subcontract Agreement, Vistant was obligated to "provide, forty-nine percent (49%) of Direct Labor of the total effort based on the requirements of the task order solicitations for the entire period of performance under the USAID Prime Contract." ECF 1, ¶ 12. According to Rumph, "[u]nder the Prime Contract, USAID has issued multiple task orders to Vistant, increasing the total contract value to approximately $45 million." *Id.* ¶ 13. But, according to Rumph, "Vistant has allocated to Rumph substantially less than 49% of all Direct Labor for the total effort for the task order solicitations issued under the USAID Prime Contract." *Id.* ¶ 14.

Rumph asserts: "As of the conclusion of the Base Period (July 1, 2021–July 30, 2022) and Option Year I (July 1, 2022–June 30, 2023) and Option Year II (July 1, 2023–June 30, 2024), Vistant has performed approximately 93% of the Direct Labor and allocated approximately 7% of the Direct Labor to Rumph." *Id.* ¶ 15. Furthermore, Rumph claims: "Vistant has failed and/or refused to allocate to Rumph the workshare promised under the Subcontract." *Id.* ¶ 16. Rumph also asserts: "As a direct and proximate result of Vistant's material breach, Rumph has suffered significant direct damages, including but not limited to lost profits and earnings, fees, general and administrative costs and other expenses, in an amount in excess of $2,000,000.00." *Id.* ¶ 23.

Additionally, Rumph claims that "Vistant is entitled to recover its reasonable attorney's fees relating to this dispute under the terms of paragraph 26(F) of the parties' Subcontract." *Id.* ¶ 24.

In pertinent part, Section 26(F) of the Subcontract, titled "Governing Law," provides, ECF 1-1 at 20:

> The laws of the state of Maryland shall govern this Agreement. Jurisdiction and venue for all purposes under this Agreement shall be the state of Maryland and the parties hereby consent to such jurisdiction and venue. In the event of any dispute hereunder, the prevailing party may be entitled to recover its reasonable attorneys' fees from the non-prevailing party.

Additional facts are included, *infra.*

## II.   Legal Principles

### A.  Fed. R. Civ. P. 55

Rule 55(b) of the Federal Rules of Civil procedure governs default judgment. In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[3]  But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence." *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[4]

---

[3] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

[4] Judge Grimm authored *Monge* when he served as a United States Magistrate Judge. He subsequently served as a United States District Court Judge in Maryland.  Judge Grimm retired from judicial service in December 2022.

The Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 588 U.S. 909 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013); *Benchmark Ins. Co. v. Total Remodeling Contractor LLC*, LKG-25-00811, 2026 WL 319051, at *3 (D. Md. Feb. 6, 2026). However, the policy is not absolute. Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). And, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebaut, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 359 F. Supp. 2d at 421.

When a default judgment is entered, plaintiff's factual allegations, other than those pertaining to damages, are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court accepts as true the well pleaded factual allegations in the Complaint as to liability). Nevertheless, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action. *Id.* at 780-81.

If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Id*. Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit. Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-

pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc*., NKM-09-0004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment, Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages.").

Rather, the court must make an independent determination regarding damages. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999). In so doing, the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2). However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc*., ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge,* 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, RAJ-06-0076, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

Pursuant to Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts

have generally held that a default judgment cannot award additional damages.").  This is meant to enable the defendant to decide whether to expend the resources to defend the action.  *Monge*, 751 F. Supp. 2d at 796.

### B.  Choice of Law

In regard to state law claims litigated in federal court based on diversity jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought.  *See e.g. Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). *See, e.g.*, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010); *see also Prof'l Massage Training Cent., Inc. v. Accreditation Alliance of Career Schools and Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015).  Maryland is the forum state.

With respect to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g. Oliveira v. Sugarman*, 451 Md. 208, 233 n.17, 152 A.3d 728, 743 n.17 (2017); *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).

The Subcontract contains a choice of law provision.  As noted, Section 26(F) of the Subcontract provides: "Jurisdiction and venue for all purposes under this Agreement shall be the

state of Maryland and the parties hereby consent to such jurisdiction and venue." ECF 1-1 at 20.

Therefore, I shall apply Maryland law.

### C.  Contract Principles

The Complaint lodges a claim for breach of contract. ECF 1, ¶¶ 18–24. In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421–22 (Hollander, J.), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).

In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals[5] said: "Maryland law requires that a plaintiff alleging a breach of contract 'must

---

[5] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's

of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (Citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

"In most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract." *Willard Packaging Co. v. Javier,* 169 Md.App. 109, 122, 899 A.2d 940, 947 (2006). Additionally, plaintiffs have the "obligation to mitigate damages." *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship,* 376 Md. 331, 355, 829 A.2d 976, 990 (2003).

Under Maryland law, the measure of damages in a breach of contract action is well settled: "'[U]pon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty.'" *Adcor Indus., Inc. v. Beretta U.S.A. Corp.*, 250 Md. App. 135, 154, 248 A.3d 1137, 1147 (2021) (quoting *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594, 936 A.2d 915, 934 (2007)).

"'[P]roximate cause' means losses that actually resulted from the breach.'" *Havtech, LLC v. Tobey-Karg Sales Agency, Inc.*, JRR-22-01051, 2024 WL 3554990, at *9 (D. Md. July 26, 2024) (quoting *Adcor Indus.*, 250 Md. App. at 154, 248 A.3d at 1147). As to the second factor, reasonable foreseeability, "Maryland follows the two-part principle established in *Hadley v.*

---

intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. However, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

*Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854), for recovery of damages for breach of contract." *Hoang,* 177 Md. App. at 594, 936 A.2d at 934.

The *Hoang* Court explained*, id.* at 594–95, 936 A.2d at 934–35 (internal citations and quotation marks omitted) (emphasis in original):

> The first aspect of that principle holds that when a contract has been breached, the non-breaching party is entitled to damages for the breach such as may fairly and reasonably be considered as arising naturally, *i.e.,* according to the usual course of things from such a breach of contract itself[.]  In other words, the plaintiff in a breach of contract action may recover general damages of the sort that are presumed to have been in the contemplation of the parties when the contract was made.
>
> Under the second aspect of the principle set forth in *Hadley v. Baxendale,* a plaintiff in a breach of contract action also is entitled to recover damages such as may fairly and reasonably be supposed to *have been in the contemplation of both parties* at the time they made the contract, as the probable result of the breach of it. Such special or consequential damages are not presumed to have been in the contemplation of the parties when they made their contract but may be shown from evidence of the particular circumstances to have been in their contemplation.

As to the third element, "'[l]osses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as reasonably certain' and are not recoverable as contract damages." *Fort Myer Constr. Corp. v. Banneker Ventures LLC*, No. 1002, Sept.term, 2019, 2021 WL 5234692, at \*21 (Md. Ct. Spec. App. Nov. 10, 2021).  In the "context of lost profits recovery for breach of contract evidence must show that breach was a substantial factor in causing the loss[.]" *Hoang*, 177 Md. App. at 607, 936 A.2d at 942 (citing cases).

In *M & R Contractors & Builders, Inc. v. Michael ("M & R")*, 215 Md. 340, 349, 138 A.2d 350, 355 (1958), the court shed light on what is required to prove lost profits with reasonable certainty:

> Courts have modified the 'certainty' rule into a more flexible one of 'reasonable certainty'. In such instances, recovery may often be based on opinion evidence,[] in the legal sense of that term, from which liberal inferences may be drawn. . . . Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with

12

certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits.

The *M & R* Court added: "Opinion evidence is that which is given by a person of ordinary capacity who has by opportunity acquired a particular knowledge outside of the limits of common observation." *Id.* at 349 n.2, 138 A.2d at 355 n.2. Furthermore, the *M & R* Court explained: "Generally, proof of actual or even estimated costs is all that is required with certainty." *Id.* at 348, 138 A.2d at 355.

### III. Discussion

#### A.

Rumph alleges that it entered a contract with Vistant; that plaintiff complied with its obligations under the contract; and that defendant failed and refused to apportion the agreed upon division of labor to Rumph. ECF 1, ¶¶ 19–22.

In particular, Rumph contends that, pursuant to the Subcontract, Vistant assumed a contractual obligation to apportion to Rumph 49% of the work awarded to Vistant in connection with the USAID Prime Contract, but failed to comply with this contractual obligation. ECF 1, ¶¶ 9–16. According to Rumph, Vistant has performed "approximately 93% of the Direct Labor and allocated approximately 7% of the Direct Labor to Rumph." *Id.* ¶ 15.

Plaintiff's allegations are supported by copies of the Subcontract (ECF 1-1; ECF 1-2); documentation that Rumph billed Vistant for services that Vistant failed to pay; and proof of the work USAID commissioned Vistant to perform, to which Rumph claims an entitlement. *See* ECF 14-4; ECF 14-5. And, given the posture of the case, plaintiff's allegations are deemed admitted.

13

Fed. R. Civ. P. 8(b)(6).  Therefore, I am satisfied that Rumph has established a breach of contract by Vistant.

**B.**

Rumph alleges that it "entered into a valid Subcontract that required Rumph to perform services determined by individual task orders." ECF 14-1 at 7.  According to Rumph, it performed work, but "Vistant breached the terms and conditions of the Subcontract by failing to pay invoices for services rendered within 30 days."  *Id.*  On this basis, Rumph contends that Vistant owes Rumph $129,774.79 in "unpaid invoices."  *Id.*; *see also id.* at 1.

However, the Complaint itself does not particularize or itemize the amounts due.  Indeed, the Complaint does not mention invoices at all.  *See* ECF 1.

Section A of the Subcontract is titled "Terms and Conditions."  ECF 1-1 at 6.  Item 6 is titled "Payment and Invoicing."  *Id.*  It provides the process by which the Subcontractor, Rumph, was to invoice Vistant.  *Id.*  Additionally, it dictates that Vistant's payment would be due to Rumph within "30 days after receipt and approval . . . of the invoice."  *Id.*

In support of its Motion, Rumph appended the unpaid invoices from Rumph to Vistant for services rendered under the Subcontract.  *See* ECF 14-4.  Each invoice has an identifying number, a date, and the total amount requested.  Moreover, each invoice includes a description of the work provided, along with the quantity, rate, and amount due.  *See, e.g.*, ECF 14-4 at 2.  Additionally, the invoices bear Rumph's letterhead and are addressed to Vistant, also known as PM Consulting Group or PMCG.  *Id.*  The dates of the invoice range from December 31, 2024 through February 28, 2025, which is within the period covered under the Subcontract.  ECF 14-4; *see* ECF 1-1; ECF 1-2.  Adding the amounts listed in all the invoices, the total sum is $259,549.58.  *See* ECF 14-4.

14

Rumph has also submitted the Affidavit of Thomas Rumph, the CEO and Founder of Rumph. ECF 14-3. He avers, *id.* ¶ 10: "Under the Subcontract, Rumph is owed $129,774.79 for services rendered that Vistant has failed to pay."

Rumph does not address the discrepancy between the amount it requests in its Motion ($129,774.79) and the total sum contained in all of the invoices ($259,549.58). *See* ECF 14-1; ECF 14-3. Moreover, as noted, plaintiff did not request a particular amount for unpaid invoices in the Complaint. Accordingly, as to unpaid invoices, I will award plaintiff the amount requested in the Motion.

## C.

As indicated, under the Subcontract, Rumph was entitled to 49% of the direct labor under Vistant's Prime Contract with USAID. ECF 1-1 at 4; ECF 1-2 at 4. In the Complaint, plaintiff claims that, "[a]s a result of Vistant's failure to provide Rumph with its contractual workshare, Rumph has been deprived of the benefit of its contractual bargain with Vistant, and suffered direct, damages, including but not limited to lost profits and earnings, fees, general and administrative costs and other expenses, in an amount in excess of $2,000,000.00." ECF 1, ¶ 17. The $2 million appears to represent the total loss sustained by plaintiff, including the claim for work performed for which invoices are unpaid.

In the Motion, Rumph clarifies that it is owed $1,556,093.52 in lost profits associated with workshare that Rumph was contractually entitled to receive from Vistant. ECF 14-1 at 1. "The loss of profits is generally measured by the difference between the contract price and the actual or estimated costs of full performance." *M & R*, 215 Md. at 346, 138 A.2d at 354; *see Automatic Retailers of Am., Inc. v. Evans Cigarette Serv. Co.*, 269 Md. 101, 109, 304 A.2d 581, 586 (1973).

Rumph's calculation of lost profits is based on publicly available data concerning the amounts awarded to Vistant under the USAID Prime Contract, records of past performance, and an affidavit by Mr. Thomas Rumph. *Id.* at 8. In addition, Rumph supports its claim for lost profits with the Affidavit of Thomas Rumph. *See* ECF 14-3. As noted, he is the CEO of Rumph. ECF 14-3, ¶ 2. Mr. Rumph is also a certified public accountant, licensed in Georgia since 1993, with thirty years of experience "in finance and accounting" with "more than thirteen (13) years in government contracting." *Id.* ¶ 3.[6]

As CEO of Rumph, Mr. Rumph has "overseen audits and compliance reviews of federal and state programs, both domestically and internationally." *Id.* ¶ 4. He asserts that he "reviewed true and corrects [sic] copies of the Subcontract, task order amounts awarded under the Prime Contract (as reported in USspending.gov), Rumph's internal billing records, Rumph's internal past performance data on the Subcontract, and internal financial summaries maintained in the ordinary course of Rumph's business." *Id.* ¶ 8.

In his Affidavit, Mr. Rumph outlines the methodology he used to calculate plaintiff's lost profits. According to Mr. Rumph, "[t]he total value of Direct Labor awarded under the Prime Contract through March 31, 2025 is $47,539,652.77." ECF 14-3, ¶ 13. He claims that the "Government has paid at least $20,974,414.55 of that amount in Direct Labor." *Id.* ¶ 14. Moreover, he contends that "Vistant retained $18,719,582.15 while allocating only $2,254,832.40

---

[6] Mr. Rumph's status as a CPA and his experience with government contracting appear to provide him with a basis to opine on the lost profits he estimates that Rumph sustained because of Vistant's breach. *See Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.,* 99 F. Supp. 2d 665, 669 (D. Md. 2000) (finding that a "certified public accountant" with "many years of experience as a management consultant" could testify as an expert under Fed. R. Evid. 702 because he had "specialized knowledge" that would assist the jury's calculation of damages).

to Rumph–just 10.75% of the work, far short of the forty-nine percent (49%) required under the Subcontract." *Id.* ¶ 15.

Mr. Rumph's calculations make use of USAspending.gov.  *Id.* ¶ 19; *see* USA SPENDING.GOV, https://perma.cc/4623-AF9V (last accessed Feb. 23, 2026) ("USA Spending").  He explains that this is a "website managed by the United States Department of the Treasury and is the official open data source for federal spending information."  ECF 14-3, ¶ 19.  Moreover, he avers that USA Spending contains data regarding federal spending, including federal awards such as contracts, grants, and loans.  *Id.*; USA Spending.

Mr. Rumph appended to his Affidavit a spreadsheet that he downloaded from USA Spending with regard to Vistant's contract with USAID.  *See* ECF 14-5.  He alleges that the spreadsheet contains, ECF 14-3, ¶ 21:

> (1) the amount awarded, (2) the date the task order was awarded, (3) the recipient of the award, in this case, PM Consulting Group, LLC d/b/a Vistant, LLC, (4) the award type; (5) a brief description of the task order, and (6) a permalink for each individual task order that opens a page on USA Spending displaying the above information and whether the task order has been paid to PM Consulting Group, LLC d/b/a Visant, LLC.

Some of the data fields that Mr. Rumph described are not reflected in the spreadsheet he submitted.  The spreadsheet spans the period of December 29, 2022 through June 30, 2026, which corresponds to the period covered by the Subcontract. *Id.*; *see* ECF 1-1 at 4; ECF 14-5.[7]  In the spreadsheet, each entry contains the same parent award ID number, 72028021A00002.  ECF 14-5.  The fields also contain the total amount awarded, the period of performance, the recipient's name, and the USAspending permalink.  *See id.*

---

[7] Of course, June 30, 2026, has not yet come to pass.

Rumph asserts that it calculated its lost profits through March 2025. ECF 14-1 at 8. The sum of the amounts in the spreadsheet from December 2022 through March 2025 equates to $18,904,397.41, not the $20,974,414.55 that Rumph asserts the government has paid Vistant. *Compare* ECF 14-3, ¶ 14 *with* ECF 14-5.

Further, Rumph asserts: "Based on the amount already paid by the Government, Rumph was contractually entitled to $10,277,463.13 of the total task orders awarded." ECF 14-3, ¶ 16. According to Rumph, this sum equates to 49% of the total amount Rumph has determined the government has paid to Vistant under the Prime Contract, based on the spreadsheet Rumph presented (ECF 14-5). *See* ECF 14-3, ¶¶ 14–16.

As indicated, Rumph claims it received $2,254,832.40 from Vistant for work under the Prime Contract. *Id.* ¶ 15. According to Rumph, the difference between what Rumph was "contractually owed" and "what it received resulted in $8,022,630.73 in lost revenue." *Id.* ¶ 17. Rumph asserts that "substantially all the billings are for Direct Labor." *Id.* ¶ 18. To determine what profit Rumph would have received, Rumph "subtracted the direct costs associated with performance" and "calculated the lost profits, consisting of General and Administrative ('G&A') expenses that it did not recoup, plus an agreed upon fee." ECF 14-1 at 8 (citing ECF 14-2, ¶¶ 13–40).[8]

Rumph calculated the direct cost[9] it would have incurred had Rumph been allocated 49% of the task orders Vistant was awarded by USAID. It did so by reviewing the direct costs and

---

[8] The term G&A refers to general and administrative expenses and is an accounting term that "measures the percentage of total revenue consumed by corporate overhead and administrative functions that support overall business operations but don't directly generate revenue." *What is General and Administrative to Revenue Ratio?*, METRICHQ (Oct. 7, 2025), https://perma.cc/TBA3-N7XX.

[9] Direct cost is a term used in accounting to refer to "expenses that a company easily trace to a specific 'cost object,' which may be a product, department or project" such as "equipment and

profit margin with regard to the task orders it had previously completed for Vistant. ECF 14-1 at 9; ECF 14-3, ¶¶ 22–26. Based on the completion of other task orders for Vistant, it had to expend approximately 77% of the revenue it received in direct costs to provide the agreed upon services. *Id.* ¶ 26. According to Rumph, 77% of the revenue to which Rumph claims entitlement under the Prime Contract ($8,022,630.73) amounts to $ 6,177,425.66. *Id.* ¶ 27. Therefore, Rumph subtracted $6,177,425.66 from the estimated lost revenue. *See* ECF 14-8 (Rumph's Spreadsheet for Lost Profits Calculation).

Then, Mr. Rumph applied an additional reduction to the estimated lost revenue to take into account Rumph's G&A rate percentage, which he claims is 17%. ECF 14-3, ¶¶ 28–32. According to Rumph, "[t]he profit permitted in government contracting is a combination of G&A and fees that are added on top of labor costs." ECF 14-1 at 9.

Mr. Rumph's source for Rumph's G&A rate percentage is "based upon Rumph's most recent audit update from the Department of Health and Human Services ('HHS')[.]" ECF 14-3, ¶ 29. Mr. Rumph appended to his Affidavit a letter from HHS dated May 20, 2025, with attachments, including a "Negotiation Agreement." ECF 14-7. The Negotiation Agreement was signed by Thomas Rumph, Jr. on May 21, 2025.[10] *Id.* at 4  It indicates that Rumph's G&A rate percentage varies between 18.16% to 12.09%. *Id.* at 3–4. Mr. Rumph's estimate of a G&A rate of 17% is on the higher end.

---

raw materials." *Direct Costs vs. Indirect Costs: What Are They, and How Are They Different?*, BUSINESS NEWS DAILY (Sept. 29, 2025) https://perma.cc/TRH3-AC9M.

[10] It is not clear to the Court whether Thomas Rumph and Thomas Rumph, Jr. are one and the same. In Mr. Rumph's Affidavit, he does not include the suffix "Jr." *See* ECF 14-3 at 2. Additionally, the signatory on the Negotiation Agreement identifies himself as a "Managing Partner" of Rumph, whereas Mr. Rumph states in his Affidavit that he is the "CEO and Founder of Rumph & Associates, P.C." *Compare* ECF 14-7 at 4 *with* ECF 14-3, ¶ 2.

To estimate Rumph's lost profits, Mr. Rumph also added a 7% profit fee. *Id.* ¶¶ 34–35. He claims: "As part of its negotiations for the Subcontract, Vistant and Rumph agreed to a 7% profit fee on all task orders issued under the Prime Contract." *Id.* ¶ 34. To calculate this fee, Rumph added together what he estimated were the direct costs and the amount reduced from the total revenue by the G&A rent percentage, $7,227,588.02, and calculated that 7% of that figure is $505,931.16. *See id.* ¶ 35.

In Mr. Rumph's Affidavit, he avers: "As part of its negotiations for the Subcontract, Vistant and Rumph agreed to a 7% profit fee on all task orders issued under the Prime Contract." ECF 14-3, ¶ 34. Mr. Rumph added this sum—$505,931.16—to his total estimate for lost profits. ECF 14-3, ¶¶ 35, 35, 37; *see* ECF 14-8. However, as best I can determine, the Subcontract Agreement does not contain an agreement for a 7% profit fee. Nor is it mentioned in the Complaint. *See* ECF 1; ECF 1-1; ECF 1-2.

To review, Mr. Rumph estimates that, based on the sum that Vistant has been awarded by USAID, 49% of the task orders would have amounted to $8,022,630.73 of revenue, not including the $2,254,832.40 Rumph has received from Vistant. ECF 14-3, ¶ 17. From this amount, Mr. Rumph deducted the accumulation of the direct costs and G&A rate percentage. *Id.* ¶¶ 27, 28, 32. But, he added to this amount the "profit fee" he claims Vistant and Rumph agreed to "on all task orders issued under the Prime Contract." *Id.* ¶¶ 34, 35. This results in the total lost profit request of $1,556,093.52. *Id.* ¶ 37.

Mr. Rumph notes that "Rumph has decided not to seek certain additional damages." *Id.* ¶ 36. He claims that "Rumph is not asking for costs it incurred related to borrowed capital after Vistant retained the majority of the work under the Prime Contract, which exceed $250,000.00" *Id.* Additionally, he claims that "Rumph's claimed damages do not include another $135,000.00

stemming from Vistant's unilateral decision to charge Rumph an extra 6% G&A." *Id.* Rumph provides no additional exhibits to substantiate these allegations of additional damages that it has elected not to pursue.

The Subcontract Agreement provides that Rumph was to receive 49% of the task orders that the government awarded to Vistant. ECF 1-1 at 4; ECF 1-2 at 4. Although the parties did not contract for Rumph to receive nearly half of the total award the government provided to Vistant, the award is a good proxy to determine the total value of the work Rumph was entitled to perform under the Subcontract Agreements.

The cost estimates that Rumph incorporates into its profit estimate come from "task orders completed by Rumph during the course of performance of the Subcontract." ECF 14-3, ¶ 23. Past performance is a useful indicator when determining lost profits. *See Macke Co. v. Pizza of Gaithersburg, Inc.,* 259 Md. 479, 491, 270 A.2d 645, 651 (1970) ("There is ample authority for the proposition that loss of profits may be projected from past performance . . . , assuming, of course, that past performance has continued long enough to the best evidence of damage which is available[.]") (internal citation omitted). Furthermore, it is appropriate for Rumph to apply Rumph's G&A rate percentage to its profit calculation as G&A rates are often used by the government to set contract prices. *See United States v. Atwood*, 348 F. App'x 827, 830 (3d Cir. 2009).

However, as stated, plaintiff has not provided any verification as to the alleged profit fee that it claims Vistant agreed to pay. Therefore, I will deduct that sum from the lost profit calculation. Accordingly, I will award Rumph $1,050,162.36 for the lost profits it sustained because of Vistant's breach.

21

**D.**

**1.**

In a diversity action such as this, a party's right to recover attorneys' fees is ordinarily governed by state law. *See Rishell v. Computer Sciences Corp.*, 702 Fed. App'x 103, 103 n.\* (4th Cir. 2017); *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451 (1st Cir. 2010); *McCollum v. State Farm Ins. Co.*, 376 Fed. App'x 217, 220 (3d Cir. 2010); *Ranger Const. Co. v. Prince William County Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979). With respect to plaintiff's request for legal fees, I shall apply Maryland law because the lawyers are members of the Maryland Bar and the litigation occurred in Maryland.

In general, Maryland follows the "American Rule," under which "a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)). "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 313 (4th Cir. 2020) (same).

"Maryland law limits the amount of contractual attorneys [sic] fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank v. Goldman*, 201 Md. App. 390, 398, 29 A.3d 724, 728 (2011). Moreover, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers*, 391 Md. at 207, 892

22

A.2d at 532; *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730 ("Current law allows a court to grant only those attorneys' fees it finds reasonable."). Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers*, 391 Md. at 207, 892 A.2d at 532.

"'The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico*, 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide "'detailed records'" that specify "'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged[.]'" *Rauch v. McCall*, 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.'" *Id.* at 639, 761 A.2d at 85 (citation omitted).

Maryland courts ordinarily utilize the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *Friolo v. Frankel*, 373 Md. 501, 504-05, 819 A.2d 354, 356 (2003). However, the Maryland Court of Appeals has held that the lodestar approach is "an inappropriate mechanism for calculating fee awards" under contractual fee-shifting provisions in "disputes between private parties over breaches of contract." *Monmouth Meadows*, 416 Md. at 336, 7 A.3d at 7; *see also E. Shore Title Co. v. Ochse*, 453 Md. 303, 337, 160 A.3d 1238, 1258 (2017) (stating that the "litigation did not involve a fee-shifting statute, and therefore the lodestar

method of calculation would not be appropriate"). This is because a "contractual fee-shifting provision is designed by the parties, not by the legislature . . . . Thus, it usually serves no larger public purpose than the interests of the parties." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505, 28 A.3d 75, 84 (2011).

In Maryland, in regard to an award based on a contract, a court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8.

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee":

    (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

    (3) the fee customarily charged in the locality for similar legal services;

    (4) the amount involved and the results obtained;

    (5) the time limitations imposed by the client or by the circumstances;

    (6) the nature and length of the professional relationship with the client;

    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    (8) whether the fee is fixed or contingent.

A list of factors similar to those in MRPC 1.5 was enunciated for use in a lodestar analysis in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

The so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, see *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978), and in Maryland. *See Friolo*, 373 Md. at 522 n. 2, 819 A. 2d at 366 n. 2.

Cases decided under the lodestar approach can "provide helpful guidance" in contractual fee-shifting cases. *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85. This is because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately." *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730; *see Monmouth Meadows*, 416 Md. at 337 n.11, 7 A.3d at 8 n.11. Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n. 13, 7 A.3d at 10 n.13.

Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment. Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337-38, 7 A.3d at 8.

This Court's Local Rules are also relevant. Local Rule 109.2(b) requires an attorneys' fees motion to be properly supported and prepared in accordance with the Court's "Rules and Guidelines for Determining Attorneys' Fees in Certain Cases," if they are applicable. *See* Local Rules App. B (the "Guidelines"). The Guidelines are applicable here, as they "apply to cases in which a prevailing party would be entitled, by applicable law or contract, to reasonable attorneys'

fees . . . ." *Id.* at 1 n.*.   Among other things, the Guidelines set out mandatory rules regarding billing format and time recordation, organized by litigation phase, and require submission of quarterly statements to opposing counsel. *Id.* § 1. It also outlines non-compensable time and reimbursable expenses and sets guidelines for hourly rates for attorneys. *Id.* §§ 2-4.

Under MRPC 1.5(a)(3), a court reviewing an attorneys' fee request must consider "the fee customarily charged in the locality for similar legal services." In this inquiry, the Fourth Circuit follows the "locality rule," whereby "'[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.'" *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted).   "Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate.   However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market." *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000) (internal citation omitted).

The Court "recently updated its Guidelines Regarding Hourly Rates in the Local Rules[.]" *Schrider v. Devlin Contracting & Maint., Inc.*, BAH-24-2978, 2026 WL 110330, at *4 (D. Md. Jan. 14, 2026).   As to the hourly rates, the Guidelines now provide, Guidelines § 3:

> Reasonable hourly rates should be determined by the Court using declarations, affidavits, stipulations by the parties, or other evidence. A useful guideline for hourly rates may be provided by the Fitzpatrick Matrix[] as adjusted annually, with a reduction of 5% to 20% (to reflect differences between the legal markets in Washington, D.C. and Maryland).

"[T]he Guidelines also make clear that the factors identified in pertinent caselaw still govern, and that a court should determine a reasonable fee award 'in accordance with relevant case law.'" *Hernandez v. Olney Enters., Inc.*, GLS-25-01528, 2026 WL 290967, at *5 (D. Md. Feb. 3, 2026) (quoting Guidelines § 3); *see Tamikka W. v. Bisignano,* GLS-21-00541, 2025 WL 3754144,

at *3 (D. Md. Dec. 29, 2025); *Trs. of Plumbers & Gasfitters Loc. 5 Ret. Sav. Fund v. Magothy Mech. LLC*, TDC-25-01249, 2025 WL 3711726, at *8 (D. Md. Dec. 22, 2025).

The Fourth Circuit has indicated that "fee matrices can be 'a useful starting point to determine fees.'" *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753 (4th Cir. 2025) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)). But, a court is not "'bound by'" the ranges specified in a fees matrix. *De Paredes*, 134 F.4th at 754 (quoting *Newport News Shipbuilding,* 591 F.3d at 229). Rather, "the court must consider all relevant evidence to determine the prevailing market rates in the relevant community, including lawyer affidavits, fee awards in similar cases, general surveys, fee matrices, and even its own personal knowledge[.]" *Id.* at 754 (internal citations and quotation marks omitted). Indeed, "[w]hen considering a published fee matrix, like the Fitzpatrick Matrix, Loc. R. App'x B.3 (D. Md. 2025), the Court cannot 'elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer or range of answers.'" *Tesfay v. Travel Centers of Am.*, CJC-25-1242, 2026 WL 171710, at *2 (D. Md. Jan. 22, 2026) (quoting *De Paredes*, 134 F.4th at 754).

With this framework, I turn to the Motion.

**2.**

Rumph is the prevailing party. And, Rumph seeks attorneys' fees under the terms of the Subcontract. ECF 14-1 at 10. As stated, Section 26(F) of the Subcontract provides, in relevant part: "In the event of any dispute hereunder, the prevailing party may be entitled to recover its reasonable attorneys' fees from the non-prevailing party." ECF 1-1 at 20.

Therefore, under the terms of the Subcontract, Rumph is entitled to reasonable attorneys' fees. Rumph requests legal fees of $37,313.27. *See, e.g.,* ECF 14 at 1; ECF 14-1 at 1.

Rumph's request for attorneys' fees is supported by the Affidavit of Todd M. Reinecker, Esquire (ECF 14-9) and multiple invoices. ECF 14-10 to ECF 14-12. Mr. Reinecker has been

27

licensed to practice law in the State of Maryland since 2002.  ECF 14-9, ¶ 2.  He is a partner with the law firm of PilieroMazza PLCCA (the "Firm") and is the Chair of the Litigation and Dispute Resolution practice group.  *Id.* ¶ 4.  The Firm has offices in Washington, DC, Boulder, Colorado, and Annapolis, Maryland.  *See Contact Us,* PILIEROMAZZA (last accessed Apr. 21, 2026), https://perma.cc/VBA4-GNRN.  Mr. Reinecker served as lead counsel in this case and "supervised, and assumed primary responsibility for, the legal services rendered in this action."  ECF 14-9, ¶ 6.

According to Reinecker, an associate of the Firm, Nathan Jahnigen, "has also assisted with this representation[.]"  *Id.* ¶ 7.  Jahnigen was admitted to the Maryland Bar in 2024.  *Id.* Additionally, another associate at the Firm, Mansitan Sow, also worked on this case.  *Id.* Reinecker did not include any information regarding Sow's legal experience or when Sow became a barred attorney.

Reinecker appended to his Affidavit a copy of the Firm's invoices to Rumph for legal services and costs incurred for its work on this case.  ECF 14-10.  He also submitted a copy of the "Statement of Account" for the Firm's work (ECF 14-11).  *See* ECF 14-9, ¶ 9.  Additionally, Reinecker submitted a "copy of unbilled work in process ('WIP') for the period August 1, 2025 through August 28, 2025."  *Id.* ¶ 10 (citing ECF 14-12).  He asserts that, through August 2025, the legal fees amounted to $37,313.37. ECF 14-9, ¶ 17.[11]

The invoices (ECF 14-10; ECF 14-12) describe the work performed; the particular person who performed the work, indicated by initials; the dates the work was performed; the length of time expended; and the hourly rate of the lawyer or paralegal.  All of the work was performed in

---

[11] In the Motion, Rumph claims that it incurred $37,313.**27** in attorneys' fees and costs, not $37,313.**37**.  *See, e.g.,* ECF 14-1 at 1, 10, 11.

2025. *See* ECF 14-10; ECF 14-12. Several of the individual entries in the invoices contain descriptions of work that include multiple activities.

For example, for an entry on May 29, 2025, Reinecker billed Rumph for 0.3 hours of his time, *i.e.*, 18 minutes, claiming that he spent this time as follows: "Analysis of content and damages methodology for motion for default judgment; attorney conference with Mr. Jahnigen regarding same." ECF 14-10. In other words, the period of time pertains to multiple tasks. This is a practice known as "block billing", *i.e.*, "'grouping, or lumping, several tasks together under a single entry, without specifying the amount of time spent on each particular task.'" *Jones v. Southpeak Interactive Corp. of Delaware*, REP-12-443, 2014 WL 2993443, at *9 (E.D. Va. July 2, 2014), *aff'd,* 777 F.3d 658 (4th Cir. 2015) (quoting *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006)). As one court has said: "This practice is problematic because it does not provide the district court with a clear sense of how many hours were performed on a particular task because multiple tasks are lopped into a single block of hours." *Triplett v. N. Carolina Dep't of Pub. Safety*, RLV-15-00075, 2017 WL 3840422, at *4 (W.D.N.C. Sept. 1, 2017).

Reinecker asserts that he "reviewed" the attached invoices "before issuance for accuracy and reasonableness." ECF 14-9, ¶ 12. He states: "From time to time, individual time entries have been adjusted downward or 'no charged' when, in the exercise of my professional judgment, adjustment is appropriate." *Id.* Reinecker also avers that "a courtesy discount of $1,000.00 was applied to the invoice dated May 16, 2025 on account of [his] recommendation that Rumph file this action in this Court and an attendant need to revise pleadings accordingly." *Id.*

Additionally, Reinecker avers that he has reviewed and adjusted the "unbilled WIP[.]" *Id.* ¶ 13. According to Reinecker, "[u]nbilled WIP for services provided during the month of August 2025 . . . will be finalized at the conclusion of the month and invoiced to Rumph in September

2025." *Id.* Additionally, Reinecker anticipates that "additional legal services and costs will be provided to Rumph in connection with this matter through the entry of any judgment, including necessary post-judgment discovery and collection efforts." *Id.* ¶ 14.

With respect to the attorneys' hourly rates, Reinecker claims that, "[a]s a Partner and Practice Group Chair with 23 years of experience practicing law in this region," he is "familiar with the prevailing market rates for similar legal services in the Baltimore/Washington, D.C. metropolitan area." *Id.* ¶ 16. According to Reinecker, "[t]he billing rates charged by PilieroMazza are well within market rates and are reasonable for this type of matter." *Id.*

As stated, Mr. Reinecker, an experienced lawyer, was admitted to the Maryland Bar in 2002. *Id.* ¶¶ 2, 3. His requested hourly rate of $625 is reasonable, and approaches the Fizpatrick Matrix range for Maryland lawyers with fifteen to nineteen years of experience ($716–$756). *See* Guidelines Appendix B § 3; *The Fitzpatrick Matrix*, FITZPATRICK MATRIX, https://perma.cc/Y9CZ-M7YT (last accessed Feb. 16, 2025).[12]

The invoices reflect that, over a six month period, Mr. Reinecker worked 27.5 hours on this case, totaling $17,187.50. *See* ECF 14-10; ECF 14-12. In particular, Mr. Reinecker's invoices reflect that he conferred with the client, reviewed and revised the Complaint, damages calculation, and the Motion and supporting exhibits. *Id.* In my view, his expenditure of time was reasonable.

Nathan Jahnigen is a lawyer with less than five years of experience. ECF 14-9, ¶ 7. The invoices reflect a billing rate for Mr. Jahnigen of $310 per hour. *See*, *e.g.*, ECF 14-10 at 11. Based on 44.1 hours of work performed by Mr. Jahnigen in 2025, Rumph seeks legal fees of $13,671.00

---

[12] The Court reduced the range of rates set forth in the Fitzpatrick Matrix by 10%, as suggested by the Local Rules, to correspond with the lower hourly rates for lawyers involved in federal litigation in Maryland, as compared to the District of Columbia. *See* Guidelines Appendix B § 3.

for Mr. Jahnigen's work.  His requested hourly rate of $310 is reasonable, and fits within the range for lawyers with two to three years of experience ($523–$542).

To be sure, lawyers at a firm often confer on cases. Conferencing can be very useful for a variety of sound reasons.  But, the Court is not required to impose on the defendant what is, to some extent, a duplicate billing.  On May 29, 2025, both Reinecker and Jahnigen block billed for their work, including conferring with each other.  ECF 14-10 at 12.  As to this case, Reinecker billed 0.3 hours and Jahnigen billed 0.9 hours for that day.  *Id.* According to Reinecker's entry on May 29, 2025, he spent his time analyzing the damages methodology in the Motion and met with Jahnigen regarding the methodology.  *Id.*  I cannot determine how much time Reinecker attributed to his conference with Jahnigen.  Accordingly, I will reduce Jahnigen's billed time by 0.3 hours, and allow 0.6 hours, at a rate of $310 per hour.

Additionally, on August 21, 2025, both Jahnigen and Reinecker billed for a telephone conference that the attorneys held with Mr. Rumph regarding the preparation of the default judgment motion.  ECF 14-12 at 2. Reinecker billed a total of 1.10 hours to account for the telephone conference with Mr. Rumph and Jahnigen and to review "damages detail and source documentation from client[.]"  *Id.*  Jahnigen billed a total of 0.7 hours, solely for the conference call.  *Id.*  Therefore, I will assume that the conference call lasted 0.7 hours and strike that time from the total that Jahnigen billed in this matter on that date.

With these modifications, Mr. Jahnigen performed a total of 43.1 hours of work on the case. In particular, he reviewed the case and relevant documents, conducted research on default procedures, drafted the default judgment motion and supporting affidavits, and conferred with Mr. Reinecker and Mr. Rumph regarding the motion. *See* ECF 14-12 at 2–3.  This amount of time

31

appears reasonable. Therefore, I shall award a fee based on 43.1 hours of work at $310 per hour, totaling $13,361.

According to the invoices, Sow billed 8.9 hours to this matter. *See* ECF 14-10. The invoices indicate that Sow had an hourly rate of $390. *See, e.g., id.* at 2. Applying this rate to the total hours billed by Sow amounts to $3,471.00. However, Mr. Reinecker did not specify the number of years Ms. Sow has been barred. Therefore, I will apply the lower hourly rate of $310 that the Firm used for Mr. Jahnigen. This reduces the sum to $2,759.00.

Ms. Sow's description of her work on March 14, 2025, states: "Attorney conference with Mr. Reinecker concerning the dispute; begin draft [sic] complaint." ECF 14-10 at 2. She worked a total of 2.9 hours. Mr. Reinecker has a corresponding entry for the same date, stating that he spent 0.3 hours conferring with Sow regarding the matter and emailed Rumph regarding damages calculations. *Id.*

As discussed, I decline to award attorneys' fees for duplicate billing. Again, this is not to suggest that conferencing lacks value. But, it seems unreasonable here to award fees to two lawyers for parallel work. Therefore, I will reduce the amount Sow billed by 0.3 hours, approximating that this is the amount of time she spent conferring with Mr. Reinecker on March 14, 2025. Accordingly, I will award fees for 2.6 hours of work, at an hourly rate of $310.

Similarly, on March 19, 2025, both Reinecker and Sow have time entries indicating that they conferred regarding revisions to the Complaint. *Id.* Reinecker's time entry reflects a total of 0.6 hours, reflecting time he spent reviewing and revising the draft complaint and conferring with Sow. *Id.* Sow's corresponding time entry describes her conferring with Reinecker, emailing Mr. Rumph, and revising the Complaint, for which she billed a total of 1.5 hours. *Id.* Because both attorneys block billed their time it is impossible to determine the exact duration of the meeting

between Sow and Reinecker. I will assume that Reinecker devoted half of the total time he billed for this entry to conferring with Sow. Accordingly, to account for the duplicate billing, I will reduce Sow's billed time by 0.3 hours, to a total of 1.2 hours for that entry. *Id.*

With these revisions, I will award a total of 8.3 hours of work for Sow, at a rate of $310 per hour. This amounts to $2,573.

Additionally, the invoices contain charges for individuals who are not referenced in Reinecker's Affidavit: Kelly Kirchgasser; Lauren Brier; Matthew Feinberg; and Lauren Aguilar.[13] The Firm invoiced Rumph a total of $2,917.00 for the work of these individuals. But, Mr. Reinecker does not specify the role that these individuals played in the litigation or their positions at the Firm. *See* ECF 14-9. Nor does he explain why it was necessary for so many attorneys to work on the case. Therefore, I will exclude their charges from the fee award.

In sum, with respect to Mr. Reinecker, I will award fees for 27.5 hours of work performed in 2025, at the rate of $625 per hour. *See* ECF 14-10; ECF 14-12. With respect to Mr. Jahnigen, I will award fees for 43.1 hours of work, at a rate of $310. *See id.* With respect to Ms. Sow, I will award fees for 8.3 hours of work, at the rate of $310. *See id.*

Reviewing the Rule 1.5 factors, the requested attorneys' fees are reasonable and appropriate. Plaintiff has supported the fee request with documentation, and the hourly rates are close to or within the Fitzpatrick Matrix, as modified by this Court, given that this litigation took place in Maryland. Furthermore, the proposed fee award is not disproportionate to the total damages award of $1,179,937.15.

---

[13] Katherine Burrows was also listed as an individual who worked on this matter. ECF 14-10 at 4. However, the firm did not charge Rumph for the work of Ms. Burrows and so her work is not incorporated in this analysis.

Additionally, the Firm charged Rumph $826.64 for expenses incurred for serving process of and filing the Complaint in court.  ECF 14-10 at 12.  These are reasonable expenses that are recoverable as part of the cost of litigation.  *See Carroll v. Paul L. Off., PLLC,* DKC-12-2041, 2013 WL 4008873, at *4 (D. Md. Aug. 2, 2013) ("Filing fees and service process fees are reasonable costs of litigation that may be recovered.").  Although language in the Subcontract only applies to attorney's fees, not costs, Fed. R. Civ. P. 54(d) provides that a prevailing party is entitled to an award of costs incurred unless a federal statute, the Federal Rules of Civil Procedure, or a court order provides otherwise. Here, no such impediment exists. Accordingly, I shall award plaintiff $826.64 in costs.

Accordingly, I shall award legal fees in the total sum of $ 33,121.50.  And, I will award costs of $826.64.

### E.

In the Complaint, Rumph requested "damages in excess of $2,000,000.00, or such amount to be proven at trial, plus pre-judgment interest and post-judgment interest, plus attorney's fees pursuant to paragraph 26(F) of the Subcontract, and such other and further relief as the Court deems just and proper."  ECF 1 at 5.  But, in the Motion, Rumph does not request an award of pre-judgment interest.

The Fourth Circuit has held that "state law applies to questions involving prejudgment interest in diversity cases." *United States v. Dollar Rent A Car Systems, Inc.,* 712 F.2d 938, 940 (4th Cir. 1983); *see Cowan Sys., L.L.C. v. Choctaw Transp., Inc.*, WDQ-11-CV-0367, 2011 WL 2791248, at *4 (D. Md. July 14, 2011).  In Maryland, if prejudgment interest is recoverable, it accrues at the constitutionally established "legal rate" of 6% simple interest per annum, *see* Md. Const., Art. III, § 57, unless otherwise specified in the parties' contract or a superseding statute. *See, e.g., Md. Nat. Bank v. Cummins,* 322 Md. 570, 600, 588 A.2d 1205, 1219 (1991) ("Absent a

contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent."); *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship,* 122 Md.App. 283, 293, 712 A.2d 126, 131 (1998).

"The purpose of pre-judgment interest is to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *Pellet v. Pellet*, 267 Md. App. 539, 555, 347 A.3d 459, 469 (2025) (citation and quotation marks omitted). In Maryland, "[p]rejudgment interest falls into one of two distinct categories—that which is discretionary and that which is awarded as of right." *Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 473 Md. 178, 189, 248 A.3d 1044, 1050 (2021).

"Whether a party is entitled to pre-judgment interest generally is left to the discretion of the trier of fact." *Pellet*, 267 Md. App. at 555, 347 A.3d at 469; *see Brethren Mut. Ins. Co. v. Filsinger*, 54 Md. App. 357, 365, 458 A.2d 880, 885 (1983) ("[T]he reason for the broad judicial discretion permitted on the question of prejudgment interest is to best afford full and fair compensation, under the circumstances of the case, to the injured party."). But, "[p]rejudgment interest is available as a matter of right when 'the obligation to pay and the amount due is certain, definite, and liquidated by a specific date prior to judgment' such that 'the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" *Nationwide,* 473 Md. at 190, 248 A.3d at 1051 (quoting *Buxton v. Buxton,* 363 Md. 634, 656, 770 A.2d 152 (2001)) (further citation omitted); *see Clucksters, LLC v. D&L Urb. Holdings, LLC*, No. 0648, Sept. Term, 2021, 2026 WL 632503, at *19 (Md. Ct. Spec. App. Mar. 6, 2026). A debt or amount is "liquidated" if it is "'settled or determined, esp[ecially] by agreement.'" *Baltimore County v. Aecom Servs., Inc*., 200 Md. App. 380, 430 n.19, 28 A.3d 11 (2011) (quoting *Black's Law Dictionary* 949 (8th ed. 1999)).

Here, the damages plaintiff requests for breach of contract stem from unpaid invoices and lost profits. The unpaid invoices show a certain amount that is due, the amount is fixed, and each invoice contains the date on which the payment was due. *See, e.g.,* ECF 14-4 at 2–3. But, plaintiff's estimate of lost profits does not have the same certainty. Instead, plaintiff's calculations are based on an approximation in regard to past performance. *See* ECF 14-3.

Of import, in the Motion plaintiff did not request an award of prejudgment interest. *See* ECF 14. Therefore, plaintiff has abandoned the request. *See Tamaris (Gibraltar) Ltd. v. Ppgamesusa.Com*, WEF-23-1692, 2024 WL 3843770, at *13 n.8 (E.D. Va. June 11, 2024) ("In the Complaint, Plaintiff . . . requested reasonable attorneys' fees and costs . . . . However, because the Plaintiff did not move for such relief under its Motion for Default Judgment, the undersigned will not consider Plaintiff's request."); *Blake v. PSI*, IDD-22-312, 2023 WL 9103092, at *4 (E.D. Va. Nov. 30, 2023) ("Since Plaintiff failed to demand any relief in her Complaint, the Court cannot award damages subsequently demanded in a Motion for Default Judgment."), *report and recommendation adopted,* 2024 WL 55479 (E.D. Va. Jan. 4, 2024); *Solis v. Smart Tech., Inc.,* IDD-12-284, 2012 WL 4866525, at *1 n.2 (E.D. Va. Aug. 27, 2012) ("Although Plaintiff seeks a number of forms of relief in her Complaint, her Motion for Default Judgment seeks only an order [for forms of relief] . . . . Therefore, Plaintiff has waived all other relief requested in the Complaint but not sought in the Motion for Default Judgment."), *report and recommendation adopted,* 2012 WL 4866512 (E.D. Va. Oct. 11, 2012).

Accordingly, I decline to award prejudgment interest.

"'Federal law, rather than state law, governs the calculation of postjudgment interest in diversity cases.'" *Cowan*, 2011 WL 2791248, at *4 (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999)). "The post-judgment interest rate on money judgments

in federal civil cases is mandatory and governed by statute." *Mahoney v. iProcess Online, Inc.*, 681 F. Supp. 3d 446, 453 (D. Md. 2023). The statute that governs postjudgment interest is found in 28 U.S.C. § 1961. Accordingly, plaintiff is entitled to postjudgment interest, in accordance with 28 U.S.C. § 1961.

### IV.    Conclusion

For the reasons stated, I shall enter judgment in favor of Rumph and against Vistant in the following amounts:

| | |
|---|---|
| Breach of Contract Damages (lost profits and invoices) | $ 1,179,937.15 |
| Attorneys' Fees | $ 33,121.50 |
| Costs | $826.64 |

An Order follows.

Date:   April 21, 2026

_____/s/_____
Ellen Lipton Hollander
United States District Judge